IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JOSHUA J. MOLITOR,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C11-0133

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.    INTRODUCTION ............................................. 2

II.   PROCEDURAL BACKGROUND ............................ 2

III.  PRINCIPLES OF REVIEW .................................. 3

IV.  FACTS ............................................................. 5
    A.   *Molitor's Education and Employment Background* ............. 5
    B.   *Administrative Hearing Testimony* ............................ 6
        1.   *Molitor's Testimony* ...................................... 6
        2.   *Vocational Expert's Testimony* ......................... 8
    C.   *Molitor's Medical History* .................................... 9

V.   CONCLUSIONS OF LAW ................................... 13
    A.   *ALJ's Disability Determination* ............................. 13
    B.   *Objections Raised By Claimant* ............................. 15
        1.   *Tatarka's Opinions* ..................................... 15
        2.   *Dr. Wright's and Dr. Notch's Opinions and the ALJ's RFC Assessment* ............................................ 17

VI.  CONCLUSION ............................................... 20

VII. ORDER ...................................................... 20

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Joshua J. Molitor on December 7, 2011, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Molitor asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Molitor requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On July 15, 2007, Molitor applied for both disability insurance benefits and SSI benefits.[1] In his applications, Molitor an inability to work since July 1, 2006 due to manic depression, obsessive compulsive disorder ("OCD"), anxiety, headaches, hearing voices, seeing things, and constant flashbacks. Molitor's applications were denied on September 27, 2007. On July 14, 2008, his applications were denied on reconsideration. On September 4, 2008, Molitor requested an administrative hearing before an Administrative Law Judge ("ALJ"). On March 10, 2010, Molitor appeared via video conference with his attorney before ALJ Thomas M. Donahue for an administrative hearing. Molitor and vocational expert Julie A. Svec testified at the hearing. In a decision dated May 17, 2010, the ALJ denied Molitor's claims. The ALJ determined that Molitor was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing his past relevant work as a mechanic or customer service worker, and work that exists in significant numbers in the national economy. Molitor appealed the

---

[1] The record contains no application for SSI benefits, however, both parties agree that Molitor applied for SSI benefits at the same time as he applied for disability insurance benefits. *See* Administrative Record at 83-87 (dated application for disability insurance benefits); *see also* Molitor's Complaint (docket number 3) at 1-2; ¶¶ 1, 5; Commissioner's Brief (docket number 15) at 3. The ALJ also stated that Defendant filed an application for SSI benefits at the same time he filed for disability insurance benefits, and issued a ruling on both applications. *See* Administrative Record at 28-39.

ALJ's decision. On October 12, 2011, the Appeals Council denied Molitor's request for review. Consequently, the ALJ's May 17, 2010 decision was adopted as the Commissioner's final decision.

On December 7, 2011, Molitor filed this action for judicial review. The Commissioner filed an Answer on March 13, 2012. On April 14, 2012, Molitor filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he is functionally capable of performing either his past work or work that exists in significant numbers in the national economy. On June 14, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 25, 2012, Molitor filed a reply brief. On February 10, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)

("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's

decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Molitor's Education and Employment Background

Molitor was born in 1972. He did not graduate from high school, but did earn his GED. At the admininstrative hearing, Molitor stated that he attended two semesters of college. He also testified that in the 1990s, when he was a mechanic, he earned an ASC certification. According to a report from his treating therapist, Molitor:

> got a GED, then an AA from Kirkwood in automotor and music. He then went to Coe and earned a B.A. in music. He was considering going to the University of Iowa to work on his masters in music when his wife became sick with cancer. Prior to 2002, he was involved in mechanical work and drag racing. His most recent job was managing the music section of Mister Money and teaching guitar lessons. He lost that job when his wife became sick due to poor attendance. He continues to play in a band most weekends. He would like to get back to having a part-time job and teaching music. He is applying for disability.

(Administrative Record at 316.)

The record contains a detailed earnings report for Molitor. The report covers the time period of 1989 to 2009. Molitor had minimal earnings (less than $100) in 1989. Between 1990 and 2002, Molitor earned between $807.63 (2002) and $12,627.20 (2000). He had no earnings in 2003 and 2004. In 2005, Molitor earned $5,992.37. In 2006, he earned $4,799.58. He has no earnings since 2007.

## B. Administrative Hearing Testimony

### 1. Molitor's Testimony

At the administrative hearing, Molitor's attorney asked Molitor to describe his health problems. Molitor answered that "I have OCD, and I'm a manic depressive, and I also like hear voices, and, and I see visions, and stuff. And I have rituals that I do."[2] Molitor further explained:

> Q: Have you had a history of problems in that regard?
> A: I actually have. I noticed I started -- the OCD thoughts were stuck in my mind. I used to call it my good luck track, or whatever. It's kind of weird, weird-sounding. Where I could see it, and I noticed it -- I think it started when I was about 12 years old, and, and that's when I noticed it first.
> Q: Can you describe some of the rituals that you have, or OCD type symptoms?
> A: A lot of it is because I start getting some of these thoughts, or I, I start hearing things, and so, what I have to do is, I have to eliminate it from my mind, and what I say is, elimination of all this crap, it's gone. I've had my -- I have my closure, and I must move on.
> Q: Is that something you say to yourself?
> A: That's what I say to myself, and I have to say that sometimes in, in a process of five to 10 times. But here lately, it's been up to 18 times.
> Q: So, the, the numbers have changed as far as --
> A: And sometimes, it changes, depending on how pure I feel on one side when I see -- because I constantly see darkness or whatever, and I try to eliminate the darkness in order to feel the pure again over on the one side, because it seems that this one side, my right-hand side, is, is where -- has to do with my future rather than, my past is on the left-hand side.
> Q: Okay, and so, how, how would that occur if, say, you were, say, you were working on a car, or just doing some mechanic --

---

[2] Administrative Record at 435.

> A: I have to, I have to stop. I get stuck in my mind. I have to stop, because all of a sudden, it feels like -- I can see where it leaves, the pureness leaves, and it's weird. It -- I can see where it leaves. It's almost like something is, is dragging it from my body or whatever, and I feel it, and I can see. It's like lines or whatever. And, and it has like its own force or whatever, and stuff. And then, when it goes, it's like, all of a sudden, like a brick falls inside of me, and I have to stop what I'm doing in order to get that back, to retract and eliminate whatever's pulling me away from my pureness, and then, I have to get it back. And sometimes, when I get stuck, I get stuck inside my mind where it's -- I'm there for a while, and, and --

(Administrative Record at 435-437.) Molitor's attorney also inquired how long it takes Molitor to get his mind straight. Molitor replied that it "depends," and it can take anywhere from 10 minutes to an entire day depending upon the circumstances. Additionally, Molitor testified that he hears voices inside his head and sees images, including a talking fly.[3] Molitor also stated that he sees a therapist weekly, and a psychiatrist monthly. In addition to counseling, Molitor is prescribed medication as treatment. Lastly, Molitor's attorney asked Molitor whether he was capable of working a full-time job:

> Q: If you had an eight-hour-a-day, five-day-a-week job, do you think you'd be able to get there?
> A: I wouldn't be able to do it.
> Q: Because?
> A: Just the way I am with my rituals, and it's, it's hard for me to even get out of the house with this. And people have looked at me. I know they laugh at me.

(Administrative Record at 442.)

---

[3] *See* Administrative Record at 438-440.

7

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie A. Svec with a hypothetical for an individual with no exertional limitations, but the individual would require an average-stress job. The vocational expert testified that under such limitations, Molitor could perform his past work as a mechanic or customer service worker. The vocational expert further testified that Molitor would have transferable skills and would be able to perform the following jobs: (1) cable splice helper (750 positions in Iowa and 38,000 positions in the nation), (2) electronics helper (850 positions in Iowa and 42,000 positions in the nation), and (3) caulker (500 positions in Iowa and 22,000 positions in the nation). Additionally, the vocational expert testified that Molitor could also perform the following unskilled jobs: (1) kitchen helper (2,000 positions in Iowa and 220,000 positions in the nation), (2) carton helper (3,000 positions in Iowa and 169,000 positions in the nation), and (3) wood machine stacker (1,000 positions in Iowa and 94,000 positions in the nation).

The ALJ asked the vocational a second hypothetical for an individual with no exertional limits, needing an average-stress level job, and being limited to no contact with the general public and minimal contact with fellow workers. Similar to the first hypothetical, the vocational expert testified that under such limitations, Molitor could perform his past work as a mechanic. The vocational expert also testified that Molitor could perform the following skilled and unskilled work: (1) paint sprayer (450 positions in Iowa and 22,000 positions in the nation), (2) bindery worker (1,000 positions in Iowa and 33,000 positions in the nation), (3) gluing machine feeder (1,000 positions in Iowa and 94,000 positions in the nation), and (4) cleaner (2,000 positions in Iowa and 200,000 positions in the nation).

Molitor's attorney also questioned the vocational expert. Molitor's attorney inquired whether an individual could find full-time competitive employment if he or she had: (1) a marked degree of limitation in social functioning, (2) a marked degree of limitation in concentration, persistence, and pace, (3) to work at a slow pace for up to one-third of the workday, and (4) to miss 3 to 4 days of work per month due to his or her

8

impairments. The vocational expert opined that such limitations would preclude Molitor from competitive employment.

### C. Molitor's Medical History

On April 10, 2007, Molitor met with Steven C. Washler, LISW, complaining of depression and anxiety. Washler noted that:

> [Molitor] had been employed at Mister Money in the music section, which he managed but was let go because of attendance problems associated with his wife's illness. . . . Losing that job has been destabilizing. He is a musician playing in a couple of bands working mainly weekend[s]. He also teaches guitar lessons with 28 students currently.

(Administrative Record at 336.) Upon examination, Washler opined that "[Molitor] presents with symptoms of depression and anxiety associated with his partner's life threatening health problems[,] destabilization of his employment and clear plans[,] and a lack of support system."[4] Washler diagnosed Molitor with recurrent depression and anxiety. Washler recommended to Molitor that he meet with a psychiatrist and his family physician for medication management. Washler also suggested therapy with a psychologist as treatment, to "develop a sense of his own direction."[5]

On September 26, 2007, Dr. Dee E. Wright, Ph.D., reviewed Molitor's medical records and provided Disability Determination Service ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Molitor. On the Psychiatric Review Technique assessment, Dr. Wright diagnosed Molitor with major depressive disorder and OCD. Dr. Wright determined that Molitor had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Wright determined that Molitor was moderately limited in his ability to: carry out detailed instructions, maintain attention

---

[4] Administrative Record at 336.

[5] *Id.*

9

and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Wright concluded that:

> The preponderance of the evidence in file does support some cognitive limitations of function in [Molitor's] case. [Molitor] would have difficulty consistently performing very complex cognitive activity that demanded prolonged attention to minute, complex details and rapid shifts in alternating attention. Despite these restrictions, [Molitor] is able to sustain sufficient concentration and attention to perform her [sic] range of non-complex, repetitive, and routine cognitive activities without significant limitations of function.
>
> The preponderance of the evidence in file would support some limitations of function with social interaction when [Molitor] is unduly stressed. Given [Molitor's] history and current presentation, he would have difficulty consistently performing activity in settings where he were required to have frequent stressful contact with large numbers of unfamiliar individuals. In a low stress and predictable environment, [Molitor] is able to engage in short-lived, superficial interaction with familiar individuals in appropriate ways when it is in his perceived interest to do so.
>
> In summary, [Molitor's] diagnosed medically determinable mental impairments do indicate limitations of function for [Molitor]; but these limitations of function do not currently meet or equal . . . listing severity. [Molitor's] allegations are credible to the extent reflected in the attached [mental] RFC [assessment] and preceding dictation. The preponderance of the evidence in file is consistent and does support [Molitor's] limitations of function as described.

(Administrative Record at 272-73.)

On December 4, 2007, Molitor met with Joan Tatarka, LISW, complaining of OCD interfering with his life. Specifically, Tatarka noted that:

> [Molitor] reports that his OCD and depression stop him from working and interfere with his life. . . . He indicates that he gets stuck on thoughts like counting and some repetitive hand motions with his OCD. Sometimes these have interfered with his performances with his band. He also worries about germs, and washes his hand every time someone touches him. He does not like to shake hands, although he will to be polite. . . . He has manicky moods in which he feels euphoric, trapped, excited, nervous, and nauseous. He can lose his temper. . . . Sometimes he sleeps too much, and at other times has difficulty sleeping. Usually his energy is adequate, although sometimes he feels like he is bouncing up the walls. . . . He has panic attacks in which he has difficulty breathing and his hands become stiff and he feels like he is choking. He has not had an anxiety attack for several months.

(Administrative Record at 315.) Upon examination, Tatarka diagnosed Molitor with major depressive disorder and OCD. Tatarka assessed a GAF score of 53 for Molitor. Tatarka recommended therapy as treatment.

On April 16, 2008, Tatarka, a treating source, filled out a Mental Impairment Questionnaire for Molitor, provided to her by Molitor's attorney. Tatarka diagnosed Molitor with major depressive disorder and OCD. Tatarka indicated that Molitor had limited success with individual therapy, including periods of functioning "fairly well" and alternating with periods of poor functioning. Tatarka opined that Molitor's prognosis was "guarded." In describing Molitor's symptoms, Tatarka found that he suffers from obsessive thinking, ritualistic actions, overwhelming fear and worry, social avoidance. Specifically, Tatarka indicated the following signs and symptoms for Molitor: thoughts of suicide, feelings of guilt and worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, apprehensive expectation, recurrent obsessions or compulsions which are a source of marked distress, emotional withdrawal or isolation, hallucinations or delusions (hearing voices), and memory impairment.

Tatarka opined that Molitor is seriously limited, but not precluded from: maintaining attention for two hour segments,[6] working in coordination with or proximity to others without being unduly distracted,[7] accepting instructions and responding appropriately to criticism from supervisors, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Tatarka also opined that Molitor is unable to meet competitive standards for: completing a normal workday and workweek without interruptions from psychologically based symptoms and dealing with normal work stress.[8] Lastly, Tatarka opined that Molitor had the following limitations: moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace varying from mild to marked. Tatarka concluded that Molitor's impairments are episodic and "he has been able to work only a brief time since I have known him, maybe a month."[9]

On August 10, 2008, Dr. Herbert L. Notch, Ph.D., reviewed Molitor's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Molitor. On the Psychiatric Review Technique asessment, Dr. Notch diagnosed Molitor with major depressive disorder and OCD. Dr. Notch determined that Molitor had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Notch determined that Molitor was moderately limited in his ability to: carry out

---

[6] Tatarka noted that "sometimes" Molitor concentrates well, but at other times he is distracted by obsessions, fear, and compulsive actions. *See* Administrative Record at 292.

[7] Tatarka noted that Molitor avoids contact with others and does not want to touch things others have touched. *Id.*

[8] Tatarka noted that Molitor becomes stressed by little things, including proximity to others, his own thoughts, and distractions from compulsive rituals. *Id.*

[9] Administrative Record at 295.

detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Molitor is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812,

815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Molitor had not engaged in substantial gainful activity since July 1, 2006. At the second step, the ALJ concluded from the medical evidence that Molitor had the following severe impairments: depression with possible manic features, anxiety, and obsessive compulsive disorder. At the third step, the ALJ found that Molitor did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Molitor's RFC as follows:

> [Molitor] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitation: He cannot work in competitive employment that has more than average stress; work stress at a level of 5 on a scale of 1/10 where 10 is the highest level of stress. He has no other serious physical or mental limitations that would significantly compromise his ability to work.

(Administrative Record at 31.) Also at the fourth step, the ALJ determined that Molitor could perform his past relevant work as a mechanic and customer service worker. Additionally, at the fifth step the ALJ also determined that based on Molitor's age, education, previous work experience, and RFC, he could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Molitor was not disabled.

## B. Objections Raised By Claimant

Molitor argues that the ALJ erred in two respects. First, Molitor argues that the ALJ failed to properly consider the opinions of Joan Tatarka, LISW, a treating source. Second, Molitor argues that the ALJ failed to properly evaluate the opinions of two state agency psychological consultants, Drs. Wright and Notch.

### 1. Tatarka's Opinions

Molitor argues that the ALJ failed to properly evaluate Tatarka's opinions. In particular, Molitor maintains that the ALJ failed to explain his reasons for discrediting Tatarka's opinions and not including her opinions in his RFC assessment for Molitor. Molitor concludes that this matter should be remanded for further consideration of Tatarka's opinions.

Tatarka, as a licenced independent social worker, is not classified as an "acceptable medical source" under the Social Security Regulations. Even though Tatarka is not an "acceptable medical source," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a licenced independent social worker, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according

to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

Sloan, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other medical evidence," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

In his decision, the ALJ addressed Tatarka's opinions as follows:

> Predicated on [Molitor's] increased subjective complaints, the new therapist on April 16, 2008, apparently decided to support [Molitor's] disability claim by indicating in a mental impairment questionnaire supplied by counsel that [Molitor] had marked limitations in social functioning and also in concentration, persistence and pace. The undersigned does not find that opinion is compatible with the longitudinal assessment of [Molitor's] medical history or the record, considered as a whole. Furthermore, of some current relevance was that no mention was made at the time that [Molitor] should be hospitalized, even though he was purportedly having serious problems with stress and complained of psychosis. He was able to continue with his relationship with his girlfriend and was to start up his band. His psychiatrist just 2 days earlier had noted that he was feeling better on his medications and he admitted that he was no longer depressed.

(Administrative Record at 35.) Furthermore, the ALJ drew the following conclusions from the evidence in the record:

> In summary, the undersigned cannot give controlling weight to the more recent statements from the treating sources of the mental health center suggesting that [Molitor] cannot work. Clearly, he has had some problems of recurring severity with respect to his feelings of anxiety, mood disorder and obsessive compulsion, etc. These seem to be usually exacerbated by undue stress which continues to be dealt with effectively by his therapist and psychiatrist through medications and the therapy

> sessions. Although he added symptoms of psychosis to his complaints on or about January 2008, he has not needed any inpatient psychiatric commitment which should have been necessary if his occupational and social functioning were deemed to be drastically compromised. He has demonstrated an ability to engage in family activities. Simply stated, his ability to socialize and deal with his several friends, ex-wife and girlfriend is compatible with a finding that he has no more than mild social problems. He clearly has no problems getting out during the week for practice sessions with his bands, performing in public places for pay, scheduling performance dates or even making business-like decision with respect to starting a new band or firing band members. His activities of daily living do not seem to be compromised in that he remains active with his music, family, friends, band practices and performances. Furthermore, his ability to successfully do the above activities indicates that he is able to concentrate with persistence and pace despite his anxiety and rituals. Therefore, there seems to be good reason to find that he is able to handle at least a routine job on a regular and continuous basis as long as he maintains the ongoing cooperation with his treatment regimen.

(Administrative Record at 37.)

Having reviewed the entire record, the Court finds that the ALJ properly considered Tatarka's opinions in accordance with SSR 06-03p. Furthermore, the ALJ properly articulated his reasons for finding Tatarka's opinions to be inconsistent with the record as a whole. *See Raney*, 396 F.3d at 1010. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Dr. Wright's and Dr. Notch's Opinions and the ALJ's RFC Assessment*

Molitor argues that the ALJ failed to properly evaluate the opinions of Drs. Wright and Notch, both non-examining state agency doctors. Specifically, Molitor maintains that the ALJ failed to include all the limitations imposed by Drs. Wright and Notch in his RFC assessment for Molitor. As a result of not including all of Dr. Wright's and Dr. Notch's

limitations in his RFC assessment, Molitor contends that the ALJ's RFC assessment is not supported by substantial evidence in the medical record as a whole. Molitor concludes that this matter should be remanded so that the ALJ can more fully and fairly develop the record with regard to his RFC, including consideration of the opinions of Drs. Wright and Notch.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d)). An ALJ is also required to "'explain in the decision the weight given to the opinions of a State agency medical . . . consultant[.]'" *Wilcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (quoting 20 C.F.R. § 404.1527(f)(2)(ii)).

Furthermore, an ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Additionally, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant

evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Here, the ALJ thoroughly reviewed Molitor's medical records and fully considered the opinions of treating and consultative sources.[10] In his decision, the ALJ specifically mentioned the findings of the state agency doctors.[11] While the ALJ may not have incorporated all of the limitations opined by Drs. Wright and Notch, the Court nevertheless finds that the ALJ properly considered the opinions of the state agency doctors and addressed them in his decision. *See Wilcockson*, 540 F.3d at 880. In drawing this conclusion, the Court bears in mind that while an ALJ is required to fully and fairly develop the record, he or she "'is not required to discuss every piece of evidence submitted.'" *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Furthermore, failure of an ALJ to cite specific evidence is not an indication that he or she failed to consider such evidence. *Id.* Thus, having reviewed the entire record, the Court finds that the ALJ properly considered Molitor's medical records, observations of treating physicians, and Molitor's own description of his limitations in making the RFC assessment for Molitor.[12] *See Lacroix*, 465 F.3d at 887. The Court also finds that the ALJ's decision is based on a fully and fairly developed record, including consideration of the opinions of Drs. Wright and Notch. *See Cox*, 495 F.3d at 618.

---

[10] *See* Administrative Record at 33-37.

[11] *Id.* at 33.

[12] *See id.* at 33-37.

In summary, because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Molitor's treating licensed independent social worker, Joan Tatarka; and non-examining state agency sources, Drs. Wright and Notch. The Court also finds that the ALJ fully and fairly developed the record with regard to the medical evidence in the case, and made a proper RFC assessment for Molitor. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 18th day of October, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA